THOMAS R. JOHNSON, OSB No. 010645
tom.johnson@stoel.com
MISHA ISAAK, OSB No. 086430
misha.isaak@stoel.com
ALEXANDRA CHOI GIZA, OSB No. 214485
alexandra.giza@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: 503-224-3380
Facsimile: 503-220-2480

*Attorneys for Defendant*
*St. Charles Health Systems, Inc.*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| KRISTINE REIGER, individually and on behalf of all other similarly situated,<br><br>               Plaintiff,<br><br>    v.<br><br>ST. CHARLES HEALTH SYSTEMS, INC., an Oregon nonprofit corporation, RAY KLEIN, INC., a foreign corporation,<br><br>          Defendants. | Case No.: 6:24-cv-00334-MC<br><br>RESPONSE TO STATE OF OREGON'S AMICUS CURIAE BRIEF BY DEFENDANT ST. CHARLES HEALTH SYSTEMS, INC. |

## I. INTRODUCTION

When parties dispute the meaning of a provision, text is king. It is telling that the Oregon Department of Justice ("DOJ") does not begin its analysis there, with ORS 646A.677(4)'s text. Nor does DOJ start with the provision's context. Rather, DOJ's analysis of ORS 646A.677(4) starts with legislative history and works its way back to the text. In doing so, DOJ proves only

that a single *legislator* wanted ORS 646A.677(4) to work the way Plaintiff advocates, but it does not prove that the *legislature* intended the same.

This becomes apparent when considering a significant fact omitted from DOJ's brief: at the time the legislator testified, no one, not even the legislator herself, had seen the text that is now ORS 646A.677(4). It had yet to be drafted. Indeed, the provision was still being negotiated. DOJ thus pins its entire analysis on a legislator's aspirations for a soon-to-be drafted, but not yet fully negotiated, provision. Her statement thus reflects not what the statute actually says, but what she hoped it might say—a hope she expressed while she was still negotiating the relevant amendment.

But that's not all. *After* ORS 646A.677(4) was drafted, the very same legislator described the provision differently. She testified that the provision required hospitals to screen patients and send them applications before sending their unpaid debt to collections. The legislator made no mention of hospitals being required to zero-out a patient's debt when a screening revealed the patient was eligible for 100% financial assistance.

Courts get to decide how much value should be placed on legislative history. None should be placed on that cited by DOJ. Not only do the statements offered by DOJ pre-exist the text at issue in this case, but the views expressed in those statements are not supported in the text that was ultimately presented to and passed by the legislature. Nor are those views supported by relevant context, the legislator's subsequent statements, or any of the rules Oregon courts use for interpreting statutes.[1]

_____

[1] DOJ files its amicus brief in the name of the State of Oregon. But, revealingly, DOJ does not purport to be acting as counsel for arms of the State with an interest in how ORS 646A.677(4) is interpreted: the Oregon Health Authority (OHA) or the legislature. Rather, DOJ seems simply to be freelancing here. St. Charles can only guess why. DOJ does not say it has ever interpreted or provided guidance on ORS 646A.677(4) before now. It may be that the first

Page 2 –    RESPONSE TO STATE OF OREGON'S AMICUS CURIAE BRIEF BY
                  DEFENDANT ST. CHARLES HEALTH SYSTEMS, INC.

124435135.2 0034080-00043

## II.  ARGUMENT

ORS 646A.677(4) tells a hospital what it must do before transferring a patient's unpaid

debt to collections:

> (a) Conduct a screening to determine if the patient qualifies for
> financial assistance as described in ORS 442.614(1)(a)(A) [which
> requires hospital's financial assistance policies to provide full
> financial forgiveness to patients within 200% of the FPL], if
> applicable; and
>
> (b) Provide a copy of its financial assistance policy to the patient
> along with an application for financial assistance.

That text is capable of only one reasonable interpretation. Hospitals must screen a patient before

sending her bill to collections to see if she is eligible for full financial assistance and send her an

application if she is. (*See generally* Dkts. 45 and 52 (St. Charles's briefing on issue).) When a

hospital fails to do that—*conduct* a screening and *send* an application—a cause of action exists

for an unlawful collection practice. ORS 646A.677(10).

As repeated throughout its briefing, St. Charles conducted a screening of Plaintiff and

sent her an application. It thus did not violate ORS 646A.677(4), and it therefore did not commit

an unlawful collection practice.

DOJ argues otherwise. Like Plaintiff, DOJ contends that St. Charles committed an

unlawful collection practice by not automatically reducing Plaintiff's debt to zero after screening

her. (*See* Dkt. 56 at 7-11.) And like Plaintiff, DOJ wholly glosses over the fact that reducing a

patient's bill is a requirement, not located in ORS 646A.677, but rather in an entirely different

statute located in an entirely different chapter, ORS 442.614. In other words, DOJ argues St.

Charles violated ORS 442.614; but that does not give rise to a cause of action under ORS

---

time anyone at DOJ had occasion to consider the meaning of this statute is when they were asked
to support Ms. Reiger's position in this case.

646A.677. *See* ORS 646A.677(10) (noting unlawful collection practice where hospital collects or attempts to collect debt that "is in violation of *this* section" (emphasis added).)

In any event, DOJ shares the same flawed view of ORS 646A.677(4) that Plaintiff has. DOJ joins her in arguing that ORS 646A.677(4)'s real meaning reveals itself when you squint at the words hard enough and ignore rules Oregon courts use in interpreting statutes. Specifically, DOJ contends that what the legislature really meant when it directed hospitals to conduct a screening to assess financial assistance eligibility was to award that relief without an application. (Dkt. 56 at 10-11.) Under DOJ's interpretation, the hospital must also send this patient, who DOJ says already should have been awarded full financial assistance, an application for relief anyway. (*Id.*) According to DOJ, statements from a legislator and a witness before the House Committee on Rules supports this interpretation. (*Id.* at 7-9.) And, according to DOJ, this interpretation is the only way the purpose behind ORS 646A.677(4) can be served. (*See id.* at 3 (stating purpose is "defeated" by St. Charles's interpretation).)

DOJ is wrong. When the state of the law at the time the legislature enacted ORS 646A.677 is accounted for and Oregon's rules on interpreting statutes are employed, it becomes clear that DOJ advances an untenable position that finds its only support in a few opportunistic statements by the bill's advocates about how they hoped ORS 646A.677(4), which had yet to be drafted, would turn out. To accept the advocates', DOJ's, and Plaintiff's interpretation would require rewriting ORS 646A.677. That is not the Court's task.

A.      **Until This Year, Applications for Financial Assistance Are Required**

The Oregon legislature did not act on a blank slate when it enacted ORS 646A.677(4) in 2019. At that time, federal law required nonprofit hospitals to have financial assistance policies as a condition for keeping their favorable tax status. *See generally* U.S.C. § 501(r)(4); 26 C.F.R.

§ 1.50(r)-4(b)(1)(iii). The law did not require there to be anything specific in those policies; it just required that they exist, that they state the eligibility criteria for financial assistance, and that they explain how to apply for it. 26 C.F.R. § 1.50(r)-4(b)(1)(iii). Thus, before 2019, Oregon hospitals implemented federal law by adopting financial assistance policies and—critically here—by requiring patients to apply for financial assistance.

In 2019, the Oregon legislature *added* to this framework by telling nonprofit hospitals what must be included in their policies. This direction takes place in what is now codified as ORS 442.614. It provides that a "nonprofit hospital's written financial assistance policy" must "[p]rovide for adjusting a patient's costs" on a sliding scale, with patients "whose household income [that] is not more than 200 percent of the federal poverty guidelines" being entitled to a 100 percent reduction under the hospital's policy. ORS 442.614(1)(a)(A). The legislature further directed nonprofit hospitals to undertake certain efforts to ensure patients are aware of their financial policies and provide help with applications when requested. This is demonstrated in several places, most notably and relevant here in ORS 646A.677(4). There, the legislature directs nonprofit hospitals to conduct a screening before sending a debt to collections to assess whether the patient is eligible for 100% relief under the hospital's policy and send the patient an application for relief if she is eligible. ORS 646A.677(4).

After several years under this regime, and to address some perceived inadequacies, the Oregon legislature again added to this space in 2023. This time, the legislature created a new, separate screening from that called for in ORS 646A.677(4). Notably, this screening specifically requires that hospitals "apply any financial assistance for which the patient qualifies" *before* sending the patient a bill. ORS 442.615(3)(c). In other words, the legislature removed the application requirement for patients who are pre-screened and determined eligible for financial

assistance. The legislature did not make any changes to the screening requirement in ORS 646A.677(4), which covers screenings *after* a bill has been sent to the patient but *before* the debt is sent to collections. It is this screening that is at issue in this case.

**B.    There's Much More to the 2019 Legislative History Than DOJ Reveals**

With that background in mind, the legislature's direction—hospitals must screen a patient before sending her debt to collections to determine if the patient is eligible for full financial assistance and send that patient an application if she does qualify—makes a lot of sense. *See* ORS 646A.677(4) (so providing). In 2019, hospitals already had financial assistance policies, and the legislature was now telling hospitals what was required to be in them and how to notify patients about it. The legislature did not go so far as to supplant the application process and tell hospitals that they must award relief without an application; that happened in 2023. *See* ORS 442.615(3)(c) (noting that hospitals are required, "before sending a bill to the patient, to conduct the screening and ***apply any financial assistance for which the patient qualifies to the bill***" (emphasis added)).

DOJ wishes this were not the case. It wants ORS 646A.677(4) to operate like the 2023 legislation. But neither the statute's text nor relevant context say that. So instead, DOJ focuses on legislative history and puts all its eggs in *that* basket. However, DOJ paints a misleading picture with the legislative history it cites.

DOJ relies on statements of Representative Andrea Salinas and a representative of Providence Hospital System, Jessica Adamson, made during a single hearing before the House Committee on Rules about HB 3076 (the bill now codified in part as ORS 646A.677). (*See* Dkt. 56 at 8-9.) These statements support the idea that hospitals are required to award relief as result of a screening under ORS 646A.677(4). (*See id.*)

Yet, at the time these statements were made, the text that is now ORS 646A.677(4) was not even drafted. *See* Audio Recording, House Committee on Rules, HB 3076, May 6, 2019, at 54:58-55:16 (Rep. Salinas telling committee she hoped the amendments would be drafted and available "very quickly," which prompted committee member to state "it's just a further frustration to discuss a bill when I don't know exactly where we are at"); *Compare* HB 3076, -7 amendments (May 9, 2019), *with* HB 3076, -6 amendments (May 1, 2019) (showing text at issue did not exist at time Rep. Salinas testified).[2] At best, these witnesses were telling the committee how they hoped ORS 646A.677(4) would work once it was reduced to writing. Their comments, then, are little more than wishes for what the finished bill could be as opposed to what the bill had indeed become through agreement with the stakeholders behind the scenes negotiating its text. In fact, their comments may well have been negotiation positioning— while negotiations were ongoing, pushing for something that has not been agreed to by treating it as if it had.

The state of play is evident just by listening to the hearing. Shortly after Representative Salinas testified in favor of the bill, Sean Kolmer, the Senior Vice President of Policy and Strategy of the Oregon Association of Hospitals and Health Systems (OAHHS), testified in opposition. Audio Recording, House Committee on Rules, HB 3076, May 6, 2019, at 58:25-59:23 (statements of Sean Kolmer). Mr. Kolmer explained that the stakeholders had been working on the bill for nearly a year and that, to Representative Salinas's credit, "a lot of the bill has changed" over that time. *Id.* at 58:34-42. However, more needed to be done. Mr. Kolmer directed the committee to the association's proposed changes that had been submitted in writing and closed his testimony by stating that "we are hoping with a new amendment and these

---

[2] All legislative materials cited in this motion are available at olis.oregonlegislature.gov/liz/2019R1/Measures/Overview/HB3076.

changes that I can sit before you with an amendment that we can be together on in this." *Id.* at

59:30-42. Those amendments included "changes to the patient screening and debt collection

sections" to address "concerns that hospitals and other stakeholders have raised[.]" Testimony,

House Committee on Rules, HB 3076, May 6, 2019 (written testimony from Oregon Association

of Hospitals and Health Systems).

When the amended bill was next circulated, it contained the text that is now ORS

646A.677(4). HB 3076, -7 amendments (May 9, 2019).[3] Mr. Kolmer testified at the next hearing

on behalf of OAHHS; he explained that "we have all spent a lot of time and energy to improve

the base bill to where it is today." Audio Recording, House Committee on Rules, HB 3076, May

13, 2019, at 15:30-47.  Mr. Kolmer testified that he wanted to "echo the comments for the

proponents of the bill … and many others who have been working on" it and that "the -7s

[amendments] reflect a lot of those conversations" between the stakeholders. *Id.* at 15:49-16:05.

With the changes to the bill, OAHHS moved from "opposition to neutrality on the bill."

Testimony, House Committee on Rules, HB 3076, May 13, 2019 (written testimony from

OAHHS); Audio Recording, HB 3076, May 13, 2019, at 16:05-28 (Mr. Kolmer testifying that

"the expected changes we are going to see not only with the -7s but with the potential -9s that are

coming, we are comfortable with being neutral on the bill moving forward").

So what exactly did ORS 646A.677(4), now that it was drafted, require? Representative

Salinas told the Senate Committee on Rules when the legislation reached that body:

> "HB 3076 requires hospitals to provide the financial assistance
> policy to anyone who requests it. The financial assistance policies
> must be made available in languages that the patient can
> understand or offer interpreters. ***[Hospitals] will be required to***

---

[3] In legislative parlance, the "-7" or "dash 7" is the seventh drafted amendment to the bill.

*send a patient to the financial assistance policy, as well as the*
*application, prior to sending the patient to debt collections*."

Audio Recording, Senate Committee on Rules, HB 3076, June 3, 2019, at 10:22-10:44 (emphasis added). Neither Representative Salinas nor Ms. Adamson (who also appeared before the Senate) mentioned their previous hope that ORS 646A.677(4) would require hospitals to award relief without an application.

**C.    A Legislator's Aspirations Cannot Override Text the Legislature Enacted**

In other words, ORS 646A.677(4) was still in negotiations at the time that Representative Salinas and Ms. Adamson testified before the House Committee on Rules. Properly understood, the statement of Representative Salinas was likely negotiation positioning. She was telling the committee what she was pressing for in the negotiation, perhaps in the hope that doing so would put pressure on OAHHS and other negotiation participants to come around to her view.

But when the negotiations settled, Representative Salinas's aspiration did not win the day. The text of the provision that was ultimately proposed and adopted made no mention of awarding financial relief as result of a screening, and these witnesses did not again opine that the provision required as much.  Nonetheless, DOJ wants this Court to use Representative Salinas's and Ms. Adamson's testimony before the House Committee on Rules to override the text of ORS 646A.677(4). That would be wrong for at least two reasons.

The first and obvious (if not fatal) reason is that the witnesses' statements were not about the text that is now ORS 646A.677(4). The statements pre-date the provision. If the goal here is to determine what the legislature as a body intended ORS 646A.677(4) to mean, then it is hard to see how statements before that provision existed have any value, especially considering that the statements come from advocates representing half the interests at stake and during a time the bill was still be negotiated. *See State v. Kelly*, 229 Or. App. 461, 466, 211 P.3d 932 (2009) ("Cherry-

picked quotations from single legislators or of nonlegislator witnesses, are likely to be given little weight, as the likelihood that such scraps of legislative history represent the views of the institution as a whole is slim."). Moreover, Representative Salinas herself later described ORS 646A.677(4) differently than she had before it was drafted. If, as DOJ urges, significant weight should be given to the "chief architect of the bill," (Dkt. 56 at 8-9), then Representative Salinas's statements about the provision's actual text should be the ones given weight. *See* Audio Recording, Senate Committee on Rules, HB 3076, June 3, 2019, at 10:22-10:44 (Rep. Salinas explaining that ORS 646A.677(4) required hospitals to screen and send applications before passing debt to collections).

The second flaw in using Representative Salinas's and Ms. Adamson's statements is that, regardless of when they were made, the statements are not consistent with ORS 646A.677(4)'s text. This renders the history useless. When noting the "pitfalls of relying too greatly on legislative history," the Oregon Supreme Court in *State v. Gaines* reminded parties of Justice Graber's take on using legislative history:

> "In general, an examination of legislative history is most useful when it is able to uncover the manifest general legislative intent behind an enactment. By contrast, an examination of legislative history is most fraught with the potential for misconstruction, misattribution of the beliefs of a single legislator or witness to the body as a whole, or abuse in the form of 'padding the record' when the views of only a small number of persons on a narrow question can be found."

346 Or. 160, 172 n. 9, 206 P.3d 1042 (2009) (quoting *Errand v. Cascade Steel Rolling Mills, Inc.*, 320 Or. 509, 539 n. 4, 888 P2d 544 (1995) (Graber, J., dissenting)). For this reason, the court explained that there "is no more persuasive evidence of the intent of the legislature than the words by which the legislature undertook to give expression to its wishes" and that "it is not the intent of the individual legislators that governs, but the intent of the legislature" that does. *Id.* at

171 (simplified). Thus, though it is for a court to decide what weight to give legislative history, where "the text of a statute is truly capable of having only one meaning, no weight can be given to legislative history that suggests—or even confirms—that legislators intended something different." *Id.* at 173.

DOJ finds itself in the scenario that *Gaines* describes. It identifies what it believes was the purpose of HB 3076—"to prevent individuals who qualify for debt forgiveness from ending up in the debt collection process"—and seizes on the statements of two bill proponents about the "narrow question" of how ORS 646A.677(4) serves that purpose. (*See* Dkt. 56 at 3 (arguing "central purpose" of bill).) DOJ notes that these proponents "testified that hospitals cannot send a patient to collections if their screening determines that the patient is eligible for 100% debt forgiveness." (*Id.* at 3.) And DOJ contends this view is supported in the text of ORS 646A.677(4) because "determine" means "the hospital must make a decision about the patient's eligibility based on its screening." (*Id.* at 11.) Only this understanding of ORS 646A.677(4), the argument goes, serves the purpose of HB 3076. (*Id.* at 3.)

That is simply not true. Assuming DOJ is correct about HB 3076's purpose, St. Charles's interpretation serves it. Screening patients for full financial assistance eligibility and sending patients who would qualify an application for relief before sending their debt to collections "prevent[s] individuals from ending up in the debt collection process." (*See* Dkt. 56 at 3 (identifying purpose of HB 3076).) So does defining by law who is eligible for financial assistance and for what amounts, as well as requiring hospitals to make sure patients are aware of financial assistance policies generally. *See generally* ORS 442.610; ORS 442.614; ORS

646A.677. There is nothing about St. Charles's proposed interpretation that is inconsistent with the general purpose of HB 3076.[4]

The same cannot be said about DOJ's interpretation. If the statute's purpose can be served only by requiring hospitals to award relief without an application under ORS 646A.677(4), then DOJ's interpretation fails to fit that bill considering that only a small fraction of patients (those qualifying for 100% relief) are awarded relief as result of a screening. This is a criticism that DOJ has failed to address. (*See* Dkt. 56 at 10 (suggesting DOJ has read the parties' briefing); Dkt. 52 at 5-7 (explaining absurd outcomes of Plaintiff's interpretation).) DOJ also wholly ignores the incredulity of sending a patient who qualifies for full financial assistance and is thus automatically awarded relief an application for financial assistance. (*See* Dkt. 56 at 10 (arguing that hospitals must "satisfy [the] two separate conditions" of screening a patient and sending the patient an application).)

It is also worth mentioning that DOJ's reliance on "determine" in ORS 646A.677(4) gets it nowhere. Maybe it is true that "determine" means "that the hospital must make a decision about the patient's eligibility based on its screening." (Dkt. 56 at 11.) But that does not mean the "decision" the hospital must make is to automatically award relief. It could be that the decision

---

[4] Because DOJ makes the same analytical misstep as Plaintiff, St. Charles must emphasize the point: identifying the broad policy goal underlying a complex piece of legislation does not aid in understanding a detail in the bill. Consider another example: Congress adopted the Affordable Care Act to promote widespread healthcare access, sure, but the legislation itself contains hundreds of pages of legislative compromises. One cannot resolve every interpretive dispute with reference to the broad policy goal since some of the ACA's provisions were designed to expand healthcare access to a lesser extent than advocates hoped.

The same is true here. HB 3076 reflects negotiation and compromise. It is clear from the legislative history that OAHHS and allies successfully pushed back on some of what the bill's advocates wanted to accomplish. To resolve every interpretive dispute as maximizing the objectives of the bill's proponents overlooks the fact that the final legislation plainly did not do everything proponents wanted.

Page 12 –    RESPONSE TO STATE OF OREGON'S AMICUS CURIAE BRIEF BY
                DEFENDANT ST. CHARLES HEALTH SYSTEMS, INC.

124435135.2 0034080-00043

to be made is whether the patient meets criteria such that she should be sent an application to

apply. Although DOJ acts like this is a novel concept, it's not. A sixteen-year-old is eligible to

obtain a driver's license. An eighteen-year-old is eligible to vote. A person with no criminal

history is eligible to carry a concealed firearm. But all these persons must apply or take some

other action to obtain the thing for which they are eligible. There is no indication in the text of

ORS 646A.677(4) that suggests anything different. In fact, given the legal landscape of charity

care when the legislature acted in 2019, it would be unreasonable to read into the text of ORS

646A.677(4) a requirement that hospitals award relief without an application.

D.    **The Oregon Health Authority's Report on Implementation of HB 3076 Assumes the Correctness of St. Charles's Interpretation**

When the legislature adopted HB 3076 in 2019, it charged the Oregon Health Authority

with assessing and reporting on implementation of the new law. *See* HB 3076 § 12 (2019).

OHA's "HB 3076 Implementation Report" carries out this directive.

The report summarizes the mandates of HB 3076. But nowhere does it say that the bill

bars hospitals from requiring patients to apply for financial assistance before granting it.

Nowhere does it say that the bill requires hospitals to write off debt automatically after screening

patients. To the contrary, the report describes the bill's screening provision this way:

> HB 3076 provides new medical debt protections. Hospitals are
> prohibited from referring patients to collections prior to screening
> them for financial assistance eligibility. If patients qualify for
> financial assistance, hospitals cannot charge interest on amounts
> still owed to the hospital.

Oregon Health Authority, "HB 3076 Implementation Report" at 2 (2019), *available at*

https://www.oregon.gov/oha/HPA/ANALYTICS/HospitalReporting/HB-3076-Comm-Benefit-

Leg-Report.pdf (visited Sept. 5, 2024).

Significantly, the report evaluates Oregon hospitals' financial assistance policies and

practices. It finds:

> Hospitals have updated their financial assistance policies (FAP) to
> be in alignment with statutory requirements for minimum levels of
> financial assistance at different income tiers. Most hospital policies
> pertaining to medical debt have also been updated to incorporate
> the added protections against referrals to collection and interest
> charges.

*Id.* at 3. The report does not say that Oregon hospitals are radically misapplying the statute's

financial assistance protections by requiring screened patients to apply before granting financial

assistance. Rather, the report says that Oregon hospitals are generally doing a good job with

compliance, despite some challenges on the margins, including that "hospital staff … report

barriers to effectively screening and notifying potentially eligible patients of financial assistance

prior to moving debts to collection." *Id.* at 3. Even this sentence seems to assume that what

happens after hospitals screen patients is: they "notify[] potentially eligible patients of financial

assistance prior to moving debts to collection." *Id.*

DOJ strains to find validation for its interpretation in the report. It refers to a statement in

the report that "HB 3076 also provides a private right of action under the ***federal*** Unfair Debt

Collection Act to patients who do not receive financial assistance and/or protection from debt

collection and interest charges as specified in the bill" (emphasis added). But that statement

references a federal law not at issue in this case. And even if it were about the part of the law at

issue in this case—ORS 646A.677(4)—the statement would be consistent with St. Charles's

reading of the statute. St. Charles does not dispute that patients who do not receive financial

assistance because they were never screened and sent an application (which was Ms. Reiger's

original allegation in the first iteration of her complaint) would have a claim under the statute.

DOJ also cites an example from the section of the report summarizing "Patient Advocate Perspectives" as proof that OHA agrees with its interpretation. But that section of the report is plainly summarizing what advocates think—that is, it is summarizing advocacy—it is not stating OHA's findings or view of the law.

DOJ is right about one thing: "The OHA report does not directly address the question whether a hospital can determine that a patient is eligible for 100% financial assistance but refer that patient to collections anyway." (Dkt. 56 at 11.) If OHA believed such a significant and glaring departure from the law's mandates were happening, one would expect the issue to be central to its report. The omission is the point. It's not worth commenting in a report on implementation of a new law that hospitals are doing something that is plainly permitted under the law. That is why "OHA does not directly address the question." There was no question to address before Ms. Reiger innovated a novel interpretation of the statute in this case.

The Court reasonably may be wondering: why does it matter what OHA thought the statute means? It matters because DOJ's position is plainly a bait-and-switch. St. Charles and many other Oregon hospitals implemented HB 3076 in good faith based on what the plain text of the statute required of them. DOJ would now impose on these nonprofit hospitals a potentially massive financial liability by reading the statute in a way they could not have predicted and that even their regulator, OHA, did not adopt.

**E.    The Court Should Reject DOJ's Interpretation**

Ultimately, DOJ urges a reading of ORS 646A.677(4) based on questionable legislative history and one that creates a host of new issues for this Court to resolve. If the debt owed by a patient eligible for 100% financial forgiveness cannot be transferred to a debt collector, then this Court must get out its pen and mark out "debt collector" in ORS 646A.677(7). And if patients

who are eligible for 100% financial assistance are automatically awarded that relief after a screening under ORS 646A.677(4), then this Court must either add "apply any financial assistance for which the patient qualifies" or strike that text from ORS 442.615(3)(c) so that "screening" can be given the same meaning in both statutes. *Vill. at Main St. Phase II, LLC v. Dep't of Revenue*, 356 Or. 164, 175, 339 P.3d 428, 434 (2014) (noting principle that "the legislature intended the same word to have the same meaning throughout related statutes unless something in the text or context of the statute suggests a contrary intention").

With these revisions, ORS 646A.677(4) would then operate to require hospitals to send patients within 200% of the federal poverty guidelines an application to apply for financial assistance that the patient has already been awarded. *See State v. Baty*, 243 Or. App. 77, 86, 259 P.3d 98 (2011) ("We presume that the legislature would not have intended such an absurd result."). The provision would also reflect a legislative determination that within a group of similarly situated persons—those entitled to financial assistance—a select few could avoid debt collection altogether while the rest of the group must fend for themselves. *See State v. Rodriguez*, 217 Or. App. 24, 34, 175 P.3d 471 (2007) (noting constitutional avoidance "is commonly invoked when there is even a tenable argument of unconstitutionality").

St. Charles certainly does not believe this is what the legislature intended when it enacted ORS 646A.677(4). And it does not believe the role of the Court is to rewrite statutes. But, if DOJ's position is to be adopted, then these would be the means required to get there and the outcomes of that effort.

### III.  CONCLUSION

For the reasons explained in this motion and more fully in its prior briefing, St. Charles

ask that the Court reject DOJ's interpretation of ORS 646A.677(4).

DATED: September 6, 2024                    STOEL RIVES LLP


                                            /s/ Misha Isaak
                                            _____
                                            THOMAS R. JOHNSON, OSB No. 010645
                                            tom.johnson@stoel.com
                                            MISHA ISAAK, OSB No. 086430
                                            misha.isaak@stoel.com
                                            ALEXANDRA CHOI GIZA, OSB No. 214485
                                            alexandra.giza@stoel.com

                                            *Attorneys for Defendant*
                                            *St. Charles Health System, Inc.*