IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

KRISTINE REIGER,                                    Case No. 6:24-cv-00334-MC

        Plaintiff,                            OPINION AND ORDER

    v.

ST. CHARLES HEALTH SYSTEM, INC.,
and RAY KLEIN, INC.,

        Defendants.
_____

MCSHANE, Judge:

    Plaintiff Kristine Reiger brings this action against Defendants St. Charles Health System and Ray Klein, seeking clarification of Oregon's charity care laws and alleging violations of Oregon's Unlawful Debt Collection Practices Act ("UDCPA"), Unlawful Trade Practices Act ("UTPA"), and the Fair Debt Collection Practices Act ("FDCPA"). Pl.'s First Am. Class Action Compl., ECF No. 36 ("FAC"). Each Defendant now moves against all opposing claims. Def. St. Charles's Mot. Dismiss, ECF No. 45 ("SC Mot."); Def. Ray Klein's Mot. Dismiss, ECF No. 46 ("RK Mot."). The State of Oregon appears in this matter as amicus curiae. Amicus Br., ECF No. 56. Oral argument was held on November 5, 2024, followed by a 30-day period of limited discovery and supplemental briefing. ECF Nos. 61, 62.

    The Court GRANTS in part and DENIES in part Defendants' Motions for the reasons stated below.

# BACKGROUND

## I. The Relevant Law

At its core, this case is a dispute over the correct interpretation of Oregon's law governing nonprofit hospitals' financial assistance policies.

In Oregon, and the United States more broadly, nonprofit hospitals are required to comply with federal and state laws as a condition of their tax-preferred status. At the federal level, these laws require nonprofit hospitals to assess community health needs, to limit charges and extraordinary collections activities, and—the subject matter of this case—to adopt written financial assistance policies that enable low-income patients to apply for debt relief. *See generally* 26 U.S.C. § 501(r); 26 C.F.R. § 1.501(r)-4(b)(1). Congress left the specifics of those policies, such as eligibility criteria, the method for applying for financial assistance, and whether such assistance includes free or discounted care, for the states to fill in. 26 U.S.C. § 501(r)(4)(A).

In 2019, Oregon's legislature filled those gaps with House Bill 3076 ("HB 3076"). H.B. 3076, 80th Or. Leg. Assemb., Reg. Sess. (Or. 2019). It has since been amended by House Bill 3320, discussed *infra*, but the events of this case are governed by the 2019 law.

HB 3076, codified in part as ORS 442.614 and ORS 646A.677, required Oregon's nonprofit hospitals to align their existing financial assistance polices with specific criteria and minimum levels of debt forgiveness. For patients earning up to 200% of the federal poverty guideline ("FPG"), a hospital's policy had to provide for adjusting the patient's costs by 100%; for a patient between 201–300% of the FPG, by a minimum of 75%; for a patient between 301–350% of the FPG, by a minimum of 50%; and for a patient between 351–400% of the FPG, by a minimum of 25%. ORS 442.614(1)(a)(A)-(D). Hospitals had to provide their financial assistance policy and application to patients upon request and include information regarding the availability

of financial assistance in each billing statement, on any relevant website, and in public displays throughout the hospital. ORS 442.610(3).

HB 3076 also placed restrictions on how and when a hospital could send a patient's unpaid charges to collections. Before a hospital could transfer an unpaid charge to a debt collector or refer an unpaid charge for collection, it was required to do two things: conduct a screening to determine if the patient's income is at or below 200% of the FPG, thereby qualifying the patient for 100% relief, and mail the patient a copy of its financial assistance policy and application. ORS 646A.677(4)(a)–(b). If the patient qualified for 100% assistance, neither the hospital, an affiliated clinic, nor a debt collector was permitted to charge interest on the patient's medical debt. ORS 646A.677(7). As a condition for providing financial assistance, the statute permitted a hospital to require a patient to respond to requests from the patient's primary insurer and to provide information about any potential third-party liability for the medical costs. ORS 646A.677(6).

In the event a hospital or debt collector failed to comply with any provision of ORS 646A.677, the statute created a cause of action under ORS 646.639, Oregon's UDCPA, if the collecting party knew, or after exercising reasonable diligence would know, that it was in violation. ORS 646A.677(10).

### A. Defendant St. Charles

St. Charles is an Oregon-based nonprofit hospital network and healthcare company. Crowl Decl. ¶ 2, ECF No. 23. It maintains a financial assistance team within its billing department that oversees St. Charles's financial assistance program. *Id.* at ¶ 3. Under that program, St. Charles's policy provides for discounts as follows: 100% assistance is given to applicants within 0–300% of the FPG; 75% assistance is given to applicants within 301–350% of

the FPG; and 50% assistance is given to applicants within 351–400% of the FPG. *Id.* at ¶ 4; Ex. B at 5 (St. Charles's financial assistance policy in 2019). St. Charles furnishes its financial assistance policy on its website, in brochures throughout the hospital, and to patients anytime someone indicates a desire to apply for financial assistance or a concern about paying for care. *Id.* at ¶¶ 5–6. St. Charles's initial registration form and billing department voicemail also notify patients of the availability of financial assistance. *Id.* at ¶¶ 7–8; Exs. D, E.

Once a patient has received services and incurred charges, St. Charles's billing department will manage the account until its closed. Crowl Decl. ¶ 2, ECF No. 77 ("Sec. Crowl Decl."). St. Charles accomplishes this through an extended business agreement with Ameri EBO, LLC. *Id.* at ¶ 6. Lacking the resources to act as a call center, St. Charles contracts with Ameri EBO to perform "collection and customer service in the name of St. Charles on non-delinquent self-pay balances." *Id.*; *see also* Dahab Decl. ¶ 5, Ex. 2 at 9, ECF No. 83. When Ameri EBO staff connect with patients about their accounts, whether it is through outbound or inbound phone calls, they represent that they are with St. Charles's billing department and they run any insurance or process any payment through St. Charles's internal billing system. Sec. Crowl Decl. at ¶ 7.

If a patient fails to pay or apply for financial assistance, the patient's account becomes "delinquent" and the billing department moves it to the next phase: collections. *Id.* at ¶¶ 3–4. The distinguishing feature between routine billing and collections is that a patient's account is not eligible for extraordinary collection actions until it reaches the latter. *Id.*; Ex. A. At a minimum, St. Charles will issue four billing statements over the course of four months during the self-pay phase before issuing the final notification that precedes transfer to a debt collector. Crowl Decl. ¶ 11. That way, the account enters the collections phase on a time frame consistent with the

limitations imposed by federal tax law. *See* 26 C.F.R. § 1.501(r)-6(c)(3)(i) (referencing the requirement for nonprofit hospitals to refrain from initiating collections actions "for at least 120 days from" the first billing statement). Because Ameri EBO does not service delinquent patient accounts and is not authorized to take extraordinary collection actions on behalf of St. Charles, Ameri EBO is not engaged during this phase. Sec. Crowl Decl. ¶ 6.

If the final notification fails to trigger a response, the billing office will then conduct a financial screening of the patient to determine financial assistance eligibility before it transfers the account to a debt collector. Crowl Decl. ¶ 14. If the screening indicates that the patient's household income is above 200% of the FPG, St. Charles sends the unpaid invoice to a collection agency. *Id.* at ¶ 15. If the screening indicates that the patient is at or below 200% of the FPG, St. Charles mails its financial assistance policy and an application to the patient, along with a letter explaining that the patient has a final 30 days to return it before the patient's account will be deemed delinquent and sent to collections. *Id.* at ¶ 16; Ex. G. After 30 days of no response, St. Charles sends the account to collections.

**B. Plaintiff Kristine Reiger**

On May 4, 2022, Plaintiff was injured in a car accident and admitted to St. Charles Medical Center for emergency care. FAC ¶ 21. Afterwards, St. Charles sent Plaintiff a letter requesting her insurance to process her invoice. Crowl Decl. ¶ 19; Ex. I. St. Charles did not receive a response. *Id.* In June, it mailed Plaintiff a billing statement requesting $1,104.42. FAC ¶ 22. Like all billing statements, this one contained a description of St. Charles's financial assistance policy, contact information for the billing department, and the internet address for the website where patients can access the financial assistance policy and application. Crowl Decl. ¶ 20; Ex. F. Plaintiff claims she never received it. FAC ¶ 22. St. Charles mailed Plaintiff follow-up

statements in July, August, September, and October. *Id.* at ¶ 24. Each time, St. Charles requested

Plaintiff to "[p]lease submit payment . . . to avoid collections or call us at 888-703-8401, 7 AM

to 5 PM Monday through Friday if you would like to make payment arrangements." Crowl Decl.

Ex. F at 4, 7, 10. Ameri EBO also placed ten outgoing calls to Plaintiff between July and

November 2022. Each time, Plaintiff did not answer and Ameri EBO left the following message:

> Hello, this is St. Charles Health Patient Financial Services. We are
> attempting to reach you regarding your account. As a reminder,
> you can access your MyChart Patient Portal to review account
> details and make a secure payment. Our representatives are
> available during normal business hours by calling 1-888-703-8401.
> Thank you for choosing St. Charles Health System.

Sec. Crowl Decl., Ex. E. Plaintiff alleges that she "called and attempted to work out a payment

plan with St. Charles, but was never able to reach St. Charles." FAC ¶ 27.

On October 22, 2022, St. Charles conducted a financial screening of Plaintiff to

determine her eligibility for financial assistance. *Id.* at ¶ 31. The screening indicated that

Plaintiff's household was 170% of the FPG, rendering her eligible for 100% financial assistance

under St. Charles's financial assistance program and Oregon's 2019 law. *Id.* at ¶ 32. St. Charles

mailed Plaintiff a packet containing its financial assistance policy, an application for assistance,

and a letter that included the following:

> If you are receiving this letter, you or your dependent may be
> eligible for financial assistance. This letter indicates that your
> balance is at risk of being referred to a collection agency. If you'd
> like to be considered for financial assistance, please complete and
> return the enclosed financial assistance application within 30 days
> from the date of this letter.

*Id.* at ¶¶ 33–34; Crowl Decl. Ex. G. The packet did not disclose that Plaintiff was eligible for

100% financial relief. FAC ¶ 35. On November 21, 2022, after not receiving any response from

Plaintiff regarding her unpaid charges or an application for financial assistance, St. Charles transferred Plaintiff's unpaid charges to debt collection agency Ray Klein. *Id.* at ¶ 39.

In March 2023, Plaintiff received notice of a small claim filed by Ray Klein in Oregon Circuit Court for $1,217.35, including $5.93 in interest. *Id.* at ¶¶ 45–46. Ray Klein served Plaintiff with a debt collection lawsuit the following April. *Id.* at ¶ 47. The court entered a judgment against Plaintiff on August 24, 2023, and sent Plaintiff notice the next day. *Id.* at ¶ 48; RK Mot. Ex. A. The judgement award stated that post-judgment interest of 9% on the award amount would accrue per ORS § 82.010. RK Mot. Ex. A at 1. Plaintiff began making payments to Ray Klein and continued through November 2023; she paid at least $1,339.18. FAC ¶¶ 49, 54.

Around three months later, on February 22, 2024, Plaintiff filed this action against St. Charles and Ray Klein, alleging that they violated Oregon's laws governing nonprofit hospitals and fair debt collection practices. Compl., ECF No. 1.

**III. The Claims**

In her original complaint, Plaintiff's central allegation was that St. Charles sent Plaintiff's debt to collections without conducting the financial screening required by HB 3076. Compl. ¶ 24. Demonstrating that allegation to be false, each Defendant moved to dismiss Plaintiff's complaint. Def. St. Charles's Mot., ECF No. 22; Def. Ray Klein's Mot., ECF No. 31. Plaintiff chose to amend her pleadings, and the motions were denied as moot. Dahab Decl. ¶ 3, ECF No. 33; Sched. Order, ECF No. 41.

In the Amended Complaint, Plaintiff pivots her theory of liability slightly. She now argues that, even with an appropriate screening, HB 3076 prohibits nonprofit hospitals from sending to collections any debt eligible for 100% financial assistance. Based on that contention,

she brings the following five claims against St. Charles and Ray Klein.[1] Plaintiff alleges that St. Charles violated Oregon's UDCPA by failing to comply with the screening and interest provisions of the 2019 law (First Claim) and violated Oregon's UTPA by misrepresenting the timing of its screenings and the patient's obligation to pay (Fourth Claim). FAC ¶¶ 64–74, 90–102. Plaintiff alleges Ray Klein also violated Oregon's UDCPA by failing to comply with the 2019 law's interest provision (Second and Third Claims) and violated the FDCPA by communicating inaccurate amounts, collecting amounts that Plaintiff did not owe, and threatening to report false credit information (Fifth Claim). *Id.* at ¶¶ 75–89, 103–18.

Following oral argument, Plaintiff now asserts a third violation of the 2019 law, alleging that St. Charles's use of Ameri EBO to call Plaintiff prior to conducting a screening violated the screening provision. Pl.'s Sur-Resp., ECF No. 73. For purposes of this Opinion, the Court groups those arguments with its discussion of Plaintiff's First Claim.

Defendants now move against all claims. St. Charles moves to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) or in the alternative for summary judgment pursuant to Federal Rule of Civil Procedure 56(a) on the First and Fourth Claims, arguing that St. Charles did not violate Oregon's financial assistance laws or cause injury to Plaintiff. SC Mot. 1. Ray Klein moves to dismiss the Second, Third, and Fifth Claims pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1), arguing that the claims fail factually and are barred by the *Rooker-Feldman* doctrine and principles of res judicata.[2] RK Mot. 7–17.

---

[1] Plaintiff seeks to assert these claims on behalf of herself and a proposed class of Oregon residents whose income was at or below 200% of the FPG when they incurred medical charges at St. Charles and whose accounts St. Charles transferred to Ray Klein for collection. FAC ¶¶ 55–63. The Court does not address the question of class certification.

[2] As explained below, Ray Klein has met its burden with respect to two of its arguments. The Court therefore declines to address every argument raised in favor of dismissal in Ray Klein's Motion.

## LEGAL STANDARD

### I. Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter that "state[s] a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); Fed. R. Civ. P. 12(b)(6). A claim is plausible on its face when the factual allegations allow the court to infer the defendant's liability based on the alleged conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). When considering a motion to dismiss, the court must accept all allegations of material fact as true and construe those facts in the light most favorable to the non-movant. *Burgert v. Lokelani Bernice Pauahi Bishop Tr.*, 200 F.3d 661, 663 (9th Cir. 2000). But the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555.

Generally, if a court considers evidence outside of the pleadings when ruling on a Rule 12(b)(6) motion to dismiss, the court must convert the motion into one for summary judgment under Rule 56. *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003). "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *Id.* at 908. Here, because Plaintiff relies on the Declaration of Kristie Crowl, ECF No. 23, in the FAC, the Court may consider it in deciding the Motions. Likewise, the Court may consider the judgment from the state court matter between Plaintiff and Ray Klein, as it was also referenced in the FAC and is judicially noticeable. *See Manufactured Home Comtys. Inc. v. City of San Jose*, 420 F.3d 1022, 1037 (9th Cir. 2005).

## II. Motion for Summary Judgment

On a motion for summary judgment, the moving party bears an initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine" dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)). A dispute is considered "genuine" if the "evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it could affect the outcome of the case. *Id.* The court reviews the evidence and draws inferences in the light most favorable to the non-moving party. *Miller v. Glenn Miller Prods.*, Inc., 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)).

## DISCUSSION

## I. St. Charles's Motion

St. Charles moves to dismiss or moves for summary judgment on Plaintiff's First and Fourth Claims. SC Mot. 1. Because the parties have fully briefed the issues, had an opportunity to discuss at oral argument, conducted limited discovery, and provided relevant evidence for the record, the Court construes St. Charles's Motion as to the First Claim as one for summary judgment. The Court does not find that Plaintiff will be prejudiced by the lack of full discovery, as the question comes down to one of statutory interpretation. Because the same cannot be said for Plaintiff's UTPA claims, however, the Court treats St. Charles's Motion as to the Fourth Claim as one for dismissal under Rule 12(b)(6).

## A. First Claim

Plaintiff's First Claim, asserting UDCPA violations for failure to comply with HB 3076, turns on the meaning of ORS 646A.677. Specifically, Plaintiff alleges St. Charles failed to comply with the screening provision found in ORS 646A.677(4) and the interest provision found in ORS 646A.677(7).

ORS 646A.677 is titled: "Requirement to screen for financial assistance before transferring medical debt for collection." ORS 646A.677(4) states, in full:

> (4) Before transferring an unpaid charge for services to a debt collector or referring an unpaid charge for collection, a hospital or hospital-affiliated clinic shall:
>
> (a) Conduct a screening to determine if the patient qualifies for financial assistance as described in ORS 442.614(1)(a)(A), if applicable; and
>
> (b) Provide a copy of its financial assistance policy to the patient along with an application for financial assistance.

ORS 646A.677(4). ORS 646A.677(7) provides:

> (7) If a patient qualifies for financial assistance under ORS 442.614(1)(a)(A), a hospital, nonprofit hospital-affiliated clinic or other debt collector may not charge interest on the patient's medical debt.

ORS 646A.677(7). As referenced in both, ORS 442.614(1)(a)(A) states:

> (1) A nonprofit hospital's written financial assistance policy described in ORS 442.610 must: (a) Provide for adjusting a patient's costs as follows: (A) For a patient whose household income is not more than 200 percent of the federal poverty guidelines, by 100 percent[.]

ORS 442.614(1)(a)(A).

Based on that language, Plaintiff alleges three separate failures on the part of St. Charles. First, Plaintiff alleges St. Charles violated ORS 646A.677(4) by failing to screen her before "referring" her charges to Ameri EBO "for collection." Second, Plaintiff alleges St. Charles violated ORS 646A.677(4) by transferring a debt to collections after a screening revealed it was eligible for 100% assistance. Third, Plaintiff alleges St. Charles violated ORS 646A.677(7) by transferring the debt to Ray Klein knowing it would charge interest. St. Charles moves against each theory, disputing Plaintiff's interpretation of the relevant language. St. Charles argues that the term "collection" as used in ORS 646A.677(4) does not include actors like Ameri EBO, and that nothing in the statute prohibits eligible debts from going to collections, it merely provides the perquisites to that transfer. On ORS 646A.677(7), St. Charles argues that the protection applies to patients that complete applications for assistance, not simply those eligible to receive assistance. Plaintiff neglected the application, so the interest provision does not apply.

Federal courts interpreting Oregon law apply Oregon statutory interpretation principles. *See Powell's Books, Inc. v. Kroger*, 622 F.3d 1202, 1209 (9th Cir. 2010). Under that framework, the "paramount goal" is to discern the legislature's intent. *State v. Gaines*, 346 Or. 160, 171 (2009); *see also* Or. Rev. Stat. § 174.020. The examination begins with the text and context of the statute. *See Dowell v. Oregon Mut. Ins. Co.*, 361 Or. 62, 67 (2017). The court may next consult the statute's legislative history where it appears useful to the analysis, but the evaluative weight given to the legislative history is for the court to determine. *Gaines*, 346 Or. at 172. "If the legislature's intent remains unclear after examining text, context, and legislative history, the court may resort to general maxims of statutory construction to aid in resolving the remaining uncertainty." *Id.*

Here, the Court is asked to resolve three related questions of statutory interpretation: (1) Does Ameri EBO fall within the type of referral contemplated by ORS 646A.677(4)? (2) Does ORS 646A.677(4) prohibit hospitals from sending to collections any debt eligible for 100% financial assistance? (3) Does ORS 646A.677(7) apply to all patients earning at or below 200% of the FPG or just the patients who have satisfied all the prerequisites to receiving 100% assistance? Taking each question in turn, the Court grants and denies St. Charles's motion for summary judgment, as explained below.

### 1. ORS 646A.677(4) does not apply to a party like Ameri EBO.

This theory arose out of oral argument. The Court, noting that St. Charles did not screen Plaintiff before engaging Ameri EBO to call her, raised questions regarding Ameri EBO's role and relationship to St. Charles. The record was insufficient to resolve this inquiry, so the Court ordered the parties to conduct limited discovery followed by supplemental briefing. The question presented was whether Ameri EBO is or should be considered a party to whom St. Charles "referr[ed] an unpaid charge for collection," such that ORS 646A.677(4) mandated a screening before Ameri EBO's involvement.

Plaintiff contends the answer is "yes." Relying on a plain meaning interpretation, Plaintiff argues that "collection" occurs anytime an "entity collects or attempts to collect the debt owed," and therefore "referring for collection" occurs when a debt "is sent or directed to a person or entity to aid in its collection." Pl.'s Sur Resp. 9. Because Plaintiff's account was sent to Ameri EBO to aid in collecting payment, ORS 646A.677(4) was triggered and St. Charles had to screen, according to Plaintiff. She supports such a broad interpretation by highlighting the textual significance in the legislature's differentiation between transfers to "debt collectors" and referrals "for collection." The inclusion of the later phrase evinces that the legislature intended ORS

646A.677(4) to apply more widely, even in the absence of a debt collector. Plaintiff, on that point, is inarguably correct. On its face, ORS 646A.677(4) applies beyond transfers to debt collectors. However, the later add-on phrase still exists within the context of the statute and is therefore modified by the former. In that way, "for collection" must be read with some limitation. And, problematically, Plaintiff's understanding of that phrase is too far divorced from its consistently understood specialized meaning.

As highlighted by St. Charles, "referring for collection" is consistently used as a term of art within the debt collection world. Def.'s Supp. Memo. 14–15, ECF No. 76. Relying on that body of law, St. Charles suggests a specialized meaning interpretation, under which "collection" refers to a point in time when the unpaid charge is delinquent and the hospital or its third parties can subject the patient to consequences through extraordinary collections activities, like garnishments, small claims, or delinquency reports to credit bureaus. Given that ORS 646A.677(4) exists as a provision of Oregon's UDCPA, the Court finds it far more likely that the legislature intended ORS 646A.677(4) to apply in a manner consistent with that specialized body of law. Moreover, understanding ORS 646A.677(4) as intervening before a patient may face extraordinary collection activities—as opposed to anytime a hospital's agent seeks payment on a bill—rings consistent with the federal tax regulations underlying Oregon's 2019 law, which sought to specifically limit extraordinary collections activities. Therefore, the Court concludes that when the legislature included the phrase "referring an unpaid charge for collection," it did not intend that phrase to take on its plain meaning, but rather a specialized meaning referring to the point in time when an unpaid charge becomes delinquent and may be subjected to extraordinary collection actions.

Having determined the correct meaning, the second task is to conclude whether Ameri EBO was engaged in that activity. Here the answer is simple. Because Ameri EBO does not handle delinquent debts and is not permitted to engage in extraordinary collections activities, the Court does not find that its role triggers ORS 646A.677(4). Therefore, St. Charles was not required to screen Plaintiff prior to giving her account to Ameri EBO for billing calls.

In evaluating Ameri EBO's function, the Court notes another unique aspect relevant to this matter—Ameri EBO is invisible to patients. Its staff identify as St. Charles, refer patients to St. Charles's website, and manage patients' accounts and requests through St. Charles's internal systems. When patients call St. Charles, its Ameri EBO staff that pick up. By all accounts, it appears that Ameri EBO seamlessly steps in where St. Charles's billing office otherwise would be, providing services that are ordinary functions of a hospital's internal billing department. Given that the legislature was specifically focused on the moment a patient may be vulnerable to the actions of debt collections agencies, and that more broadly these laws historically seek to address the coercive impact of debt collectors, the Court finds it counterintuitive to conclude the legislature envisioned ORS 646A.677(4) to apply to an agency relationship like the one Ameri EBO has with St. Charles.

The Court therefore concludes that "referring for collection" specifically concerns delinquent debts ripe for extraordinary collections measures. ORS 646A.677(4) is therefore not triggered by Ameri EBO, and St. Charles was not required to screen Plaintiff before sharing her account with Ameri EBO for billing calls.

**2. ORS 646A.677(4) does not preclude debts eligible for 100% financial assistance from being transferred to collections.**

Next, Plaintiff alleges that St. Charles violated ORS 646A.677(4) by transferring her unpaid charges to collections after a screening determined that she qualified for 100% financial

assistance. St. Charles moves for summary judgment on this claim, arguing that nothing in the text says a hospital cannot transfer the debt of an individual who would qualify for assistance. For reasons slightly different than what St. Charles asserts, the Court agrees that summary judgment is proper as to this claim.

Under ORS 646A.677(4), hospitals must do two things before sending unpaid charges to collections: "(a) [c]onduct a screening to determine if the patient qualifies for financial assistance as described in ORS 442.614(1)(a)(A), if applicable; and (b) [p]rovide a copy of its financial assistance policy to the patient along with an application for financial assistance." ORS 646A.677(4). As referenced in step (a), ORS 442.614(1)(a)(A) describes that a hospital's financial assistance policy must provide a means of adjusting 100% of the costs of patients whose income is at or below 200% of the FPG. ORS 442.614(1)(a)(A).

Plaintiff reads this language as prohibiting a hospital from sending unpaid charges to collections "[i]f the hospital determines from its screening that the patient qualifies for 100% bill forgiveness." Pl.'s Resp. 11. She argues that the legislature's use of the word "qualifies" "confirms that it intended a patient's entitlement to 100% bill forgiveness be established by a hospital's screening." *Id.* at 12. And further, that nothing in the statute "requires a patient who the hospital has determined qualifies for 100% bill forgiveness to submit an application before forgiving their debt." *Id.* For a few reasons, Plaintiff's argument fails.

First, "qualifies" does not mean "guarantees." If one is "qualified" to receive aid or an award, it merely means that person is fit or eligible to receive such a benefit. It does not mean that one is automatically assured of it. [3] By way of example, when one qualifies for the

---

[3] "If the legislature has not defined a statutory term, Oregon courts 'ordinarily look to the plain meaning of a statute's text as a key first step in determining what particular terms mean.'" *Brunozzi v. Cable Commc'ns, Inc.*, 851 F.3d 990, 998–99 (9th Cir. 2017) (quoting *Comcast Corp. v. Dept. of Revenue*, 356 Or. 282, 337 (2014)). In this pursuit, "Oregon courts regularly consult *Webster's Third New International Dictionary*" to define terms, "on the

Olympics, that person is eligible to compete for a gold medal. When one qualifies for financial aid, the receipt of funds is still contingent on compliance with application requirements. This statute operates the same way. One "qualifies" for 100% financial assistance under ORS 442.614(1)(a)(A) if the patient's income is below 200% of the FPG. But that statute stops short of granting automatic forgiveness. ORS 442.614(1)(a)(A) does not state that hospitals "must adjust" the patient's bill. It states that the policy "must *provide for* adjusting" the bill. The distinction matters. The legislature still permitted hospitals to condition assistance on the patient meeting certain requirements, such as responding to requests from the primary insurer or providing information about potential third-party liability. ORS 646A.677(6). Similarly, the statute provides for the utilization of applications in the provision of assistance, inherently demonstrating that the legislature did not intend for hospitals to forgive debts unilaterally.

Consequently, a determination of whether a patient "qualifies" for 100% assistance under ORS 442.614(1)(a)(A) is different than a determination of whether the patient will actually receive 100% assistance. ORS 442.614(1)(a)(A) merely describes a category of patient eligible for full bill forgiveness. It does not compel hospitals to apply that assistance, nor does it prohibit hospitals from placing conditions on qualifying patients receiving that aid. Read together then, ORS 646A.677(4) requires hospitals to screen with the goal of determining whether a patient qualifies for 100% financial assistance by virtue of being at or below 200% of the FPG. Plaintiff points to nothing, and there is nothing, in the statutory text that supports her conclusion that screenings result in automatic debt forgiveness.

---

assumption that, if the legislature did not give the term a specialized definition, the dictionary definition reflects the meaning that the legislature would naturally have intended." *Id.* at 999. Webster's defines "qualify" as "to be or become fit (as for an office): meet the required standard" or "to exhibit a required degree of ability in a preliminary contest." Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/qualify (visited June 2, 2025).

This understanding is consistent with the implications of step (b), which directs hospitals to send the patient a policy and application. If Plaintiff were correct that hospitals are required to forgive a patient's debt based on the screening, why would the legislature require them to proceed to the second step? It would make no sense to compel hospitals to send an application to someone who's debt the hospital is required to ignore.

Likewise, the Oregon legislature's recent passing of House Bill 3320 confirms the Court's conclusion. Under the newly enacted amendments, where a patient is found to qualify for assistance, the hospital must "apply any financial assistance for which the patient qualifies to the bill." *See* H.B. 3320, 82nd Or. Leg. Assemb., Reg. Sess. (Or. 2023), at §§ 1(2), 1(3). These significant changes to the 2019 law demonstrate that the legislature was perfectly capable of clearly stating what Plaintiff argues the legislature intended to say back in 2019. If Plaintiff brought these claims based on the wording found in HB 3320, the outcome here would be very different. Instead, Plaintiff would have the Court read the significant changes made in HB 3320 into the much different wording of the 2019 statute.

At times in her brief, Plaintiff appears to concede that St. Charles was not required to forgive her debt, but she nonetheless maintains the position that St. Charles could not involve a debt collector. *See* Pl.'s Resp. 11 ("St. Charles may not have been required to actually give Ms. Reiger financial assistance until she completed an application, but that does not mean the law allowed St. Charles to refer her account to collections, especially knowing that the debt collector would then add interest to it.") To the extent this is her argument, it fails for the same reasons. Nothing in the statutory language states that debts eligible for 100% financial assistance are prohibited from being sent to collections. Instead, the legislature mandated the steps a hospital must take "*before* transferring medical debt for collection." *See* ORS 646A.677 (emphasis

added). Had the legislature desired to draw a clear line prohibiting that transfer for specific debts, it had the ability and opportunity to do so.

ORS 646A.677(7) also demonstrates why Plaintiff's interpretation must fail. That provision prohibits a debt collector from charging interest on a medical debt if the "patient qualifies for financial assistance under ORS 442.614(1)(a)(A)." ORS 646A.677(7). If Plaintiff's interpretation was right, there would be no scenarios where such a debt should make it to a debt collector, rendering ORS 646A.677(7) superfluous. More importantly, however, the presence of ORS 646A.677(7) reveals that the legislature envisioned a scenario where a patient below 200% of the FPG would be validly transferred to a debt collector.

For these reasons, the Court cannot agree with Plaintiff's interpretation of the statute. ORS 646A.677(4) requires hospitals, before sending unpaid charges to collections, to (a) conduct a screening to determine if the patient is income-qualified for 100% financial assistance and (b) mail the patient a copy of the financial assistance policy and an application. Because St. Charles conducted the requisite screening and sent Plaintiff a policy and application before transferring her debt to Ray Klein, St. Charles complied with ORS 646A.677(4) and Plaintiff's UDCPA claim for violation of ORS 646A.677(4) fails.[4]

Summary judgment is therefore granted in St. Charles's favor as to Plaintiff's claims arising out of ORS 646A.677(4).

---

[4] The Court acknowledges that in briefing this issue, the parties disagreed as to whether ORS 646A.677(4) required St. Charles to send a policy and application to all patients before transferring to them a debt collector, or simply those who earn at or below 200% of the FPG. *See* SC Mot. 18; Pl.'s Resp. 13. As explained, Plaintiff is correct. ORS 646A.677(4) clearly requires that hospitals satisfy both "(a) . . . ; and (b)." Despite their disagreement however, St. Charles has demonstrated that with respect to Ms. Reiger, St. Charles conducted the proper screening and sent her the proper documents prior to sending her to collections. Therefore, as to this Plaintiff, St. Charles complied with both prongs of ORS 646A.677(4) and no claim lies.

### 3. ORS 646A.677(7) applied to Plaintiff's debt because she qualified for financial assistance under ORS 442.614(1)(a)(A).

Plaintiff's final allegation is that St. Charles violated Oregon's UDCPA by failing to comply with ORS 646A.677(7) when it sent her unpaid charges to Ray Klein knowing Ray Klein would unlawfully collect interest. St. Charles moves for summary judgment on this claim, arguing that the interest provision in ORS 646A.677(7) did not apply to Plaintiff because she did not complete an application. For the reasons explained above and below, the Court denies St. Charles's motion for summary judgment on this claim.

ORS 646A.677(7) states that "[i]f a patient qualifies for financial assistance under ORS 442.614(1)(a)(A), a hospital . . . or other debt collector may not charge interest on the patient's medical debt." ORS 646A.677(7). Plaintiff qualified for financial assistance under ORS 442.614(1)(a)(A) because her income was below 200% of the FPG. Therefore, collecting parties were not permitted to charge interest on her debt.

St. Charles offers a different interpretation. It submits that patients only "qualify" for financial assistance under ORS 442.614(1)(a)(A) if they submit a completed application to St. Charles per its policy, which Plaintiff did not. SC Mot. 23. Because ORS 442.614 explicitly pertains to requirements for hospitals' financial assistance polices, St. Charles reads any reference to "qualifying" under that statute as demanding that patients are both (a) at or below 200% of the FPG and (b) compliant with the requirements of a hospital's financial assistance policy.

Although St. Charles's reading is reasonable, the result of its interpretation demonstrates why it cannot be correct. If a patient was income-qualified for 100% forgiveness and complied with all requirements under the hospital's policy, there would be no debt left to collect interest

on. Said another way, they wouldn't merely be "qualified" to receive the assistance, they would receive the assistance, and their debt adjusted to $0.00. ORS 646A.677(7) would be pointless.

Instead, ORS 646A.677(7) must be read as applying to the debt of patients who are eligible for 100% assistance because their income is at or below 200% of the FPG. Not only is this understanding consistent internally and with the underlying purpose of the Bill, but it also gives meaning to the screening provision in ORS 646A.677(4) which directs hospitals to search specifically for the lowest income level. Layering the two provisions together, hospitals intending to send unpaid charges to collections must "[c]onduct a screening to determine if the patient qualifies for financial assistance as described in ORS 442.614(1)(a)(A)," because "[i]f a patient qualifies for financial assistance under ORS 442.614(1)(a)(A), a hospital . . . or other debt collector may not charge interest on the patient's medical debt." ORS 646A.677(4), (7). St. Charles's screening determined that Plaintiff qualified for 100% forgiveness, so interest could not be charged on her debt. Plaintiff was not required to complete a financial assistance application or satisfy all requirements under St. Charles's financial assistance policy in order for the interest provision to apply. St. Charles Motion for summary judgment is therefore denied as to this claim.

### B. Fourth Claim

Plaintiff's Fourth Claim alleges St. Charles violated the UTPA (a) by misrepresenting that it screens patients "as early as possible" when in practice it attempted to collect payment from Plaintiff before screening her and (b) by not disclosing to Plaintiff that she was eligible for 100% assistance under ORS 442.614(1)(a)(A) when it transferred her unpaid charges to Ray Klein. FAC ¶¶ 93–94; Pl.'s Resp. 21.

St. Charles moves to dismiss for failure to state a claim, arguing that the FAC fails to demonstrate that Plaintiff suffered an "ascertainable loss" as a result of the misrepresentations alleged. SC Mot. 25–26. The Court agrees.

To state a claim under the UTPA, Plaintiff must demonstrate that she "suffer[ed] an ascertainable loss . . . as a result of" St. Charles's allegedly unlawful practice. ORS 646.638(1). For a loss of money to be "a result of" an unlawful practice, the loss must be "occasioned by" the practice. *See Gemignani v. Pete*, 187 Or. App. 584, 591 (2003). Here, Plaintiff alleges that her "ascertainable loss" is the money she paid Ray Klein, but she fails to causally connect that loss to St. Charles's "misleading impression" that it screens patients "as early as possible." Whether the screening occurred on day one or day one hundred, the screening alone would not have eliminated Plaintiff's obligation to pay because she was required to comply with the policy and complete an application. The loss therefore precipitated from circumstances other than St. Charles's alleged misrepresentation.

Likewise, Plaintiff's allegations fail to show that Plaintiff would not have paid Ray Klein had St. Charles informed her that it determined she qualified for 100% assistance. Plaintiff argues that "by withholding the results of its screening St. Charles made 'false or misleading representations of fact concerning the . . . existence of, or amounts of price reductions,' and 'false or misleading representations concerning credit availability or the nature of the transaction or obligation incurred.'" Pl.'s Resp. 25. However, as stated above, the results of the screening do not dictate the amount owed. The screening merely revealed that Plaintiff was eligible to receive financial assistance. Which is precisely what her letter stated: "If you are receiving this letter, you or your dependent may be eligible for financial assistance." It then

directed her to fill out an application, if she wanted the assistance. Omitting that she is eligible for 100% assistance cannot be said to be a misrepresentation that resulted in her loss of money.

Plaintiff's allegations therefore fail to state a claim for UTPA violations. St. Charles's Motion to dismiss Plaintiff's Fourth Claim is granted. However, out of an abundance of caution, the Court dismisses Plaintiff's Fourth Claim without prejudice and with leave to amend in light of this Opinion's findings.

## II. Ray Klein's Motion

Plaintiff asserts her Second, Third, and Fifth Claims against Ray Klein. The Second and Third Claims allege that Ray Klein's conduct in collecting on Plaintiff's debt and charging interest, when it "knew or after exercising reasonable diligence would have known that Plaintiff . . . qualified for financial assistance," constituted a violation of the UDCPA. FAC ¶¶ 82, 88. The Fifth Claim alleges Ray Klein violated the FDCPA "by communicating to Plaintiff that she owed amounts that she did not owe because she qualified for financial assistance," "by collecting and attempting to collect amounts Plaintiff did not owe," and "by threatening to report false negative credit information." FAC ¶¶ 114–16.

Ray Klein moves to dismiss these claims pursuant to Rule 12(b)(6), offering several theories as to why they fail. Because Ray Klein has met its burden with respect to two of those arguments, the Court declines to address the remainder of Ray Klein's Motion. Additionally, the Court notes that there is a significant amount of overlap between the allegations that Plaintiff directs at St. Charles—asserting that Plaintiff's debt should have been discharged or not transferred—and the allegations directed at Ray Klein. To the extent Plaintiff's claims against Ray Klein rely on the same argument that Plaintiff did not owe a debt, those claims fail for the reasons discussed above. Plaintiff did not complete a financial assistance application and

therefore St. Charles was not required to adjust her debt to $0.00. Nothing in the statute required St. Charles to forgive her debt based purely on screening results, and no language prohibited St. Charles from transferring Plaintiff's account to Ray Klein. Those conclusions apply equally here. To the extent the previous analysis does not apply, the claims fail as explained below.

First, on Plaintiff's Second Claim, Ray Klein is correct that Plaintiff failed to demonstrate a necessary component of her claim. "A violation of ORS 646A.677 is an unlawful collection practice as defined under Oregon's UDCPA if the hospital or debt collector knows, or after exercising reasonable diligence would know, it is in violation of ORS 646A.677." ORS 646A.677(10). For Ray Klein to be liable for a UDCPA violation of the interest provision in ORS 646A.677(7), Ray Klein must have known or after exercising reasonable diligence would have known that Plaintiff qualified for 100% assistance. The Amended Complaint, however, fails to allege facts demonstrating Ray Klein's awareness of Plaintiff's financial assistance status. In fact, it alleges that St. Charles understood Plaintiff did not "qualify" and transferred the debt on that basis. Why then Ray Klein would or should have known that Plaintiff qualified and was immune from interest is unclear. Plaintiff highlights a federal law that requires hospitals and debt collectors to ensure patients aren't sued until reasonable efforts are made to determine a patient's eligibility, but she points to no rule requiring Ray Klein to conduct an independent screening of Plaintiff's financial standing. *See* FAC ¶ 19. Without more, the FAC lacks factual allegations that would lead the Court to plausibly infer that Ray Klein had the requisite awareness.

Second, even if Plaintiff had adequately pled her Second Claim, the Court nonetheless agrees that res judicata bars all three claims asserted against Ray Klein.[5] Also known as claim preclusion, res judicata "bars litigation in a subsequent action of any claims that were raised or

---

[5] Res judicata may be raised as an affirmative defense in a motion to dismiss under Rule 12(b)(6). *Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984).

could have been raised in the prior action." *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001) (quoting *West'n Radio Servs. Co. v. Glickman*, 123 F.3d 1189, 1192 (9th Cir. 1997)). "The doctrine is applicable whenever there is '(1) an identity of claims, (2) a final judgment on the merits, and (3) identity or privity between parties.'" *Id.* "The central criterion in determining whether there is an identity of claims between the first and second adjudications is whether the two suits arise out of the same transactional nucleus of facts.'" *Id.* at 714 (cleaned up) (quoting *Frank v. United Airlines, Inc.*, 216 F.3d 845, 851 (9th Cir. 2000)). "It is immaterial whether the claims asserted subsequent to the judgment were actually pursued in the action that led to the judgment; rather, the relevant inquiry is whether they could have been brought." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 322 F.3d 1064, 1078 (9th Cir. 2003) (quoting *United States ex rel. Barajas v. Northrop Corp.*, 147 F.3d 905, 909 (9th Cir. 1998)).

Here, the default judgment from the Circuit Court precludes Plaintiff from relitigating the matter in this action against Ray Klein. The Circuit Court issued a default judgment, which constitutes a final judgment on the merits, and the dispute was between Plaintiff and Ray Klein, which satisfies privity of parties. The question turns on whether this second action is based on the same factual transaction that was at issue in the first. There, the Circuit Court assessed whether Plaintiff was liable for the debt, what she owed, and what interest applied. Here, Plaintiff returns to court seeking relief from that order, alleging she is not liable for the debt or the interest, and challenging the validity of the judgment. The laws invoked and the claims brought currently were all available to Plaintiff during the state court proceeding. It does not matter that the issues presented here were not actually litigated in the state court proceeding; it matters that Plaintiff could have brought these claims. Because the two actions rely on the same

facts, Plaintiff could have brought her claims against Ray Klein in the prior litigation, and they are now barred.

Ray Klein's Motion to Dismiss is granted as to the Second, Third, and Fifth claims.

## **CONCLUSION**

For the reasons stated above, Defendant St. Charles's Motion, ECF No. 45, and Defendant Ray Klein's Motion, ECF No. 46, are granted and denied as follows. The Court grants St. Charles's Motion for summary judgment as to Plaintiff's First Claim alleging violations of ORS 646A.677(4) and denies the Motion as to Plaintiff's First Claim alleging violations of ORS 646A.677(7). The Court grants St. Charles's Motion to dismiss Plaintiff's Fourth Claim. The Court grants Ray Klein's Motion to dismiss Plaintiff's Second, Third, and Fifth Claims.


IT IS SO ORDERED.

DATED this 13th day of June 2025.


s/Michael J. McShane
Michael McShane
United States District Judge